121 F.3d 548
 156 L.R.R.M. (BNA) 2001, 134 Lab.Cas. P 10,056,
97 Cal. Daily Op. Serv. 6545,
97 Daily Journal D.A.R. 10,683
 PROVIDENCE ALASKA MEDICAL CENTER, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Alaska Nurses Association and American Nurses Association,
Respondents-Intervenors.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Alaska Nurses Association and American Nurses Association,
Petitioners-Intervenors,
v.
PROVIDENCE ALASKA MEDICAL CENTER, Respondent.
 Nos. 96-70595, 96-70649.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 16, 1997.
Decided Aug. 18, 1997.
 
 Stephen M. Rummage, Davis Wright Tremaine, Seattle, WA, for petitioner-respondent.
 David A. Fleisher, National Labor Relations Board, Washington, DC, for National Labor Relations Board.
 Matthew T. Halliday, Spokane, WA, for respondent-cross-petitioner-intervenor Alaska Nurses Association.
 Barbara J. Sapin, American Nurses Association, Washington, DC, for respondent-cross-petitioner-intervenor American Nurses Association.
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board. NLRB No. 19-CA-24469.
 Before: WALLACE, JOHN T. NOONAN, Jr., and THOMPSON, Circuit Judges.
 Opinion by Judge THOMPSON; Dissent by Judge NOONAN.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 The issue we decide in this case is whether registered nurses (RNs) who are employed by a medical center as "charge nurses" are "supervisors" within the meaning of Section 2(11) of the National Labor Relations Act (NLRA), 29 U.S.C. § 152(11).
 
 
 2
 The Alaska Nurses Association (Alaska Nurses) petitioned the National Labor Relations Board (the Board) to become the union representative for the RNs employed by Providence Alaska Medical Center (Providence). The Board conducted a representation hearing and the Regional Director determined which nurses belonged in the proposed bargaining unit. Providence requested review by the Board. The Board affirmed the decision of the Regional Director, an election was held, and a majority of the RNs in the bargaining unit voted for Alaska Nurses to become their bargaining representative.
 
 
 3
 To test the propriety of the Alaska Nurses' certification as the bargaining representative of the Providence RNs, Providence declined to bargain. The Alaska Nurses filed with the Board an unfair labor practice charge alleging that Providence's refusal to bargain violated Sections 8(a)(1) and 8(a)(5) of the NLRA, 29 U.S.C. §§ 158(a)(1) and (5). The Board granted summary judgment in favor of Alaska Nurses, concluding that Providence had violated the NLRA by refusing to bargain. See Providence Hospital, 321 N.L.R.B. No. 100 (July 10, 1996). Providence petitions for review of that decision and the Board applies for enforcement.
 
 
 4
 Providence contends that the RNs in five disputed positions are supervisors within the meaning of Section 2(11) of the NLRA; as such, they are not protected under the NLRA, and their votes should not have been counted in the election for union representation.[1]
 
 
 5
 We review the Board's findings on the supervisory status of RNs in only one of the five disputed positions-the charge nurse position. This is because without the votes of the charge nurses, the Alaska Nurses would lose the election; if these votes are counted, Alaska Nurses wins the election.
 
 
 6
 We have jurisdiction under 29 U.S.C. §§ 160(e) and (f). We conclude the RNs in the charge nurse category are not supervisors within the meaning of Section 2(11) of the NLRA, and thus their votes were properly counted in the union representation election won by Alaska Nurses. We deny Providence's petition for review, and grant the Board's cross-application for enforcement.[2]
 
 FACTS
 
 7
 Providence operates a 341-bed acute care hospital in Anchorage, Alaska. Providence employs approximately 1600 people, 700 of whom are RNs. The RNs in the disputed charge nurse positions work in four of Providence's six care centers: medical, surgical, and oncology care; neuromuscular/skeletal rehabilitation care; emergency services; and women's and children's care.
 
 
 8
 Three out of these four care centers have a permanent supervisory RN. When the supervisory RN is present, she serves as the RN charge nurse. When the supervisory RN is absent, or off-shift, one of the designated RNs in the center rotates into the position of charge nurse. At all times that an RN serves as a charge nurse, a shift coordinator is present in the hospital and available for coordination of RN scheduling.
 
 
 9
 Approximately 25% of the RNs at Providence act as charge nurses. These RNs are paid five percent more than their normal wages for the hours they work as charge nurses. When working as a charge nurse, an RN assumes a lighter patient load than other RNs, and is responsible for performing various administrative tasks.
 
 
 10
 The percentage of time spent by designated RNs as charge nurses varies from 5% to 95%, depending on the center in which the RN works. Each center, and often each unit within each center, has a different method of selecting RNs to be charge nurses. However, the general responsibilities of a charge nurse are the same, regardless of the center or unit in which the charge nurse works. It is for this reason that the Board chose not to analyze separately the duties of charge nurses in different centers and units. The Board instead "provide[d] a generalized analysis" of the supervisory status of RNs in all of the disputed charge nurse positions. In reviewing the Board's findings, we do the same.
 
 DISCUSSION
 
 11
 We defer to the Board's reasonably defensible interpretation and application of the NLRA. NLRB v. Unbelievable, Inc., 71 F.3d 1434, 1438 (9th Cir.1995). The Board's findings of fact are conclusive if supported by substantial evidence. California Pac. Med. Ctr. v. NLRB, 87 F.3d 304, 307 (9th Cir.1996). Because the Board has expertise "in making the subtle and complex distinctions between supervisors and employees, ... the normal deference [we] give to the Board is particularly strong when it makes those determinations." NLRB v. S.R.D.C., Inc., 45 F.3d 328, 333 (9th Cir.1995) (internal citation and quotations omitted).
 
 
 12
 Section 2(3) of the NLRA excludes supervisors from the protection of the NLRA.[3] 29 U.S.C. § 152(3). Section 2(11) of the NLRA defines a supervisor as:
 
 
 13
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a routine or clerical nature, but requires the use of independent judgment.
 
 
 14
 29 U.S.C. § 152(11).
 
 
 15
 Section 2(11) "requires the resolution of three questions; and each must be answered in the affirmative if an employee is to be deemed a supervisor." NLRB v. Health Care & Retirement Corp. of America, 511 U.S. 571, 573-74, 114 S.Ct. 1778, 1780-81, 128 L.Ed.2d 586 (1994). The three questions are: (1) "does the employee have authority to engage in one of the 12 ... activities [listed in Section 2(11) ]?"; (2) "does the exercise of that authority require the use of independent judgment?"; (3) "does the employee hold the authority in the interest of the employer?" Id. (internal citation and quotations omitted).
 
 
 16
 With regard to the last of these questions, we conclude the charge nurses exercised their authority in the interests of Providence, their employer. The Court's decision in Health Care & Retirement compels this conclusion. There, the Court overturned the Board's interpretation of the phrase "in the interest of the employer" by holding that, when [a] ... nurse attends to "the needs of a nursing home's patients, who are the [nurse's] employer's customers," the nurse acts "in the interest of the employer." Id. at 577, 114 S.Ct. at 1782. The charge nurses in this case clearly act in the interest of the employer.
 
 
 17
 We next consider the first two questions posed by Health Care & Retirement. In the context of the issues presented by Providence, this inquiry requires us to analyze the extent to which the charge nurses exercise independent judgment in the assignment and responsible direction of others. In making this inquiry, we are mindful of the Court's observation in Health Care & Retirement that it is "no doubt true" "the phrases in [section] 2(11) such as 'independent judgment' and 'responsibly to direct' are ambiguous, so the Board needs to be given ample room to apply them to different categories of employees." Id. at 574, 579, 114 S.Ct. at 1780-83.
 
 
 18
 It is undisputed the charge nurses have the responsibility of assigning employees to particular tasks. Providence challenges the Board's finding that in making these assignments the charge nurses do not exercise independent judgment.
 
 
 19
 The supervisory RN or center director for a unit prepares the monthly schedule, which indicates when each RN is on duty. At the beginning of the shift, the charge nurse on duty assigns staff to particular patients. To make an assignment, the charge nurse considers the needs of the patient, the skills of the staff, and the experience of the staff members available.
 
 
 20
 Substantial evidence supports the Board's finding that the charge nurses' work assignment responsibilities do not require the exercise of independent judgment. The charge nurses do not create the work schedule for other RNs. Rather, they make assignments of nurses to patients within the parameters of the supervisory nurse's monthly assignment schedule. See Highland Superstores, Inc. v. NLRB, 927 F.2d 918, 921 (6th Cir.1991) (leadmen warehouse workers were not supervisors partially because, while they assigned work to other employees every day, their assignment authority was limited by their supervisor's schedule of incoming and outgoing trucks to be unloaded). Further, the charge nurses are not alone in assigning nurses to attend patients. RNs themselves sometimes participate in the assignment process, seek out other RNs for specialized tasks, and swap patients.
 
 
 21
 We conclude the charge nurses' assignment of RNs to patients at the beginning of each shift is a routine activity that does not require the exercise of independent judgment. See generally J.L.M., Inc. v. NLRB, 31 F.3d 79, 82 (2d Cir.1994) (laundry worker responsible for deciding which laundry the laundry department did first and "assigning laundry duties to the other employees in the department" did not exercise independent judgment); but see American Diversified Foods, Inc. v. NLRB, 640 F.2d 893, 896 (7th Cir.1981) (fast food shift manager responsible for assigning fast food workers to particular tasks on a shift did exercise independent judgment because the shift manager based his assignment decisions "at least in part ... on the requirements of the specific job and his opinion of [an] ... employee's individual capabilities.").
 
 
 22
 In addition to their work assignment duties, charge nurses have some scheduling responsibility. They verify RN attendance. If an RN is absent, the charge nurse on duty is responsible for finding a replacement. All charge nurses first check with the shift coordinator to see if a replacement is available at the hospital, and then call employees in to work based on a pre-prepared staffing list.
 
 
 23
 A charge nurse also determines if her center is understaffed or overstaffed at the beginning of her shift. If the center is understaffed, and the shift coordinator is unable to find an extra RN at the hospital, the charge nurse may call in RNs or authorize overtime. The charge nurse may not, however, order an employee to work overtime. If the center is overstaffed, the charge nurse first informs the staff coordinator to see if the extra employees may be of help elsewhere in the hospital, and if not, the charge nurse may ask, but not order, an employee to leave early. At the end of a shift, the charge nurse determines the staffing needs for the next shift, and may make adjustments by calling the staff coordinator or asking RNs to stay for an extra shift.
 
 
 24
 Application of our precedent indicates these scheduling activities are more clerical than supervisory, and do not involve the exercise of independent judgment. In NLRB v. St. Francis Hosp. of Lynwood, 601 F.2d 404 (9th Cir.1979), we considered a case similar to this one. We were faced with the question whether assistant head nurses, who worked under a supervisory nurse for a given medical unit, were supervisors within the meaning of Section 2(11). Like the charge nurses in the present case, the assistant head nurses only made scheduling decisions when the supervisory nurse was absent. See id. at 421. The assistant head nurses "coordinate[d] work and vacation schedules, meals off, rest periods, and locat[ed] replacements when the need ar[ose]." Id. We agreed with the Board that "[s]uch activity [wa]s more clerical than supervisory." Id.
 
 
 25
 Several years later, in NLRB v. Bakers of Paris, Inc., 929 F.2d 1427 (9th Cir.1991), we again considered facts similar to the present case. In Bakers of Paris, the employer argued two employees were supervisors within the meaning of Section 2(11) of the NLRA. We held that, even though the two employees could approve absences, they did not exercise independent judgment in so doing, because the only way they could allow an absence was if "there was not much work to do." Id. at 1446. Although the two employees "arranged workers' schedules," because they "did nothing more than staff positions within a set schedule according to the availability of workers," their scheduling responsibilities were "more clerical than supervisory." Id. at 1447. This was especially true because "[t]here [was] no evidence that [the two employees] had the authority to require an employee's attendance at a particular time." Id.
 
 
 26
 As in St. Francis, a charge nurse in the present case is only "in charge" when her supervisory nurse is absent. See St. Francis, 601 F.2d at 421. Even when she is in charge, a charge nurse is confined to working within the parameters of her supervisor's assignment schedule. See id.; see also Bakers of Paris, 929 F.2d at 1447. A charge nurse may only compensate for over- or understaffing after following a designated procedure which involves consulting the staff coordinator, and then either asking for volunteers or checking a predetermined roster. See Waverly-Cedar Falls Health Care Ctr., Inc. v. NLRB, 933 F.2d 626, 630 (8th Cir.1991) (existence of policy which licensed practical nurses (LPNs) followed to call in replacement nurses when other nurses were absent indicated the LPNs did not exercise independent judgment in calling in other nurses).
 
 
 27
 Further, like the employees in Bakers of Paris, a charge nurse's decision to ask RNs to work overtime or leave early is based primarily on a routine evaluation of how much work there is to do in the unit during that shift. See Bakers of Paris, 929 F.2d at 1446. And, although a charge nurse may ask an RN to work late or come in on a day when the RN is not assigned to work, unlike the supervisory nurse, the charge nurse may not order the RN to do so. See id. at 1447.
 
 
 28
 Providence argues the Board erred as a matter of law when it concluded that charge nurses who ask other employees to work overtime do not exercise independent judgment. We disagree. We have found no Ninth Circuit or Supreme Court precedent supporting this argument. This is not surprising. In asking an RN to work overtime, a charge nurse does nothing more than attempt to find someone to fill a slot for necessary overtime work. Performing that job function does not involve independent judgment.
 
 
 29
 Charge nurses also decide whether to approve or disapprove employees' breaks. We agree with the Board that the charge nurses' break approval responsibility is merely routine in nature. A charge nurse's decision to authorize breaks involves, at least partially, the routine task of ensuring that all of the RNs in a unit do not take their breaks at the same time. The record indicates, moreover, that charge nurses often rely on the discretion of staff RNs to ask for breaks only at appropriate times. We conclude the charge nurses' ability to approve or disapprove RN breaks does not require the exercise of independent judgment. See St. Francis, 601 F.2d at 421 (coordinating rest periods and meals off was more clerical than supervisory).
 
 
 30
 Charge nurses also coordinate patient care within their units. Providence argues the Board erred in finding that this coordination does not constitute responsible direction in the exercise of the charge nurses' independent judgment.
 
 
 31
 To decide whether the charge nurses' coordination activities rise to the level of responsible direction requiring the exercise of independent judgment, we consider whether the charge nurses are "above the grade of 'straw bosses, lead men, set-up men, and other minor supervisory employees,' " such that "[t]heir essential managerial duties are best defined by the words 'direct responsibility'." 93 Cong. Rec. 4678 (May 7, 1947) (testimony of Senator Flanders). "The leadman or straw boss may give minor orders or directives ... but he is not necessarily ... a 'supervisor' within the [NLRA]." NLRB v. Doctor's Hosp. of Modesto, 489 F.2d 772, 776 (9th Cir.1973). The test to determine if an employee responsibly directs others is applied "with respect to the fundamental twin principles that a supervisor represents the interests of his employer vis-a-vis other employees and is not 'one of the gang who merely gives routine instructions.' " Meredith Corp. v. NLRB, 679 F.2d 1332, 1337 (10th Cir.1982) (quoting and citing Goldies, Inc. v. NLRB, 628 F.2d 706, 709 (1st Cir.1980)).
 
 
 32
 An employee responsibly directs others when the employee is "answerable" to the employer for other employees' "discharge of a duty or obligation." Arizona Public Service Co. v. NLRB, 453 F.2d 228, 231 (9th Cir.1971) (quoting NLRB v. Fullerton Publishing Co., 283 F.2d 545, 549 (9th Cir.1960)); see also Meredith, 679 F.2d at 1337 ("in directing other employees, a person is a supervisor only if he directs qua employer or qua representative of the employer, such as a foreman might do."); cf. Beverly California Corp. v. NLRB, 970 F.2d 1548, 1550 (6th Cir.1992) (RN supervisor found to be a supervisor under the NLRA because she "was ultimately responsible for nursing care in [her] units, and the evidence showed that she was expected to oversee the work of all [employees in the unit] to insure that proper health care was being provided across the board.").
 
 
 33
 Our review of the record indicates the Providence charge nurses are, in many ways, "one of the gang" with the RNs on their shift. See Meredith, 679 F.2d at 1337. Both staff RNs and charge nurses evaluate one another, intervene in problem situations, and make entries on the end-of-shift report. In addition, the charge nurse on a particular shift may be a staff RN on another shift.
 
 
 34
 Further, charge nurses have little involvement in telling other nurses what to do. To the extent a charge nurse gives routine guidance to other RNs, she does so more in the capacity of a leadman or straw boss than anything else. By exercising her professional judgment in this routine manner while working alongside and guiding less experienced employees, the charge nurse is not transformed into a supervisor. See NLRB v. Adco Electric Inc., 6 F.3d 1110, 1117 (5th Cir.1993) (employee was not a supervisor because his "status was that of a skilled craftsman guiding less experienced employees," and because he "spent ninety percent of his time working with his tools alongside co-workers"); cf. Yeshiva, 444 U.S. at 690, 100 S.Ct. at 866 (observing, in the analogous context of the NLRA's managerial exclusion, "[o]nly if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will be found aligned with management.").
 
 
 35
 We conclude the charge nurses are not "above the grade of 'straw bosses, lead men, set-up men, and other minor supervisory employees." See 93 Cong. Rec. 4678 (May 7, 1947) (testimony of Senator Flanders). Substantial evidence supports the Board's finding that the charge nurses do not exercise independent judgment to responsibly direct other employees.
 
 
 36
 Providence argues, however, that the charge nurses must be supervisors, for, if they are not, Providence would have only one on-site supervisor (the Shift Coordinator) during the evening, night, and weekend shifts.[4] Providence's argument is not persuasive. That a supervisory nurse is not present during some shifts does not necessarily indicate the charge nurses are supervisors. See NLRB v. Res-Care, Inc., 705 F.2d 1461, 1467 (7th Cir.1983) ("[a]lthough on the evening ... and night ... shifts the licensed practical nurses are the highest-ranking employees on the premises, this does not ipso facto make them supervisors.").
 
 
 37
 Even though a supervisory nurse may not be physically present during the evening, night, and weekend shifts, a supervisory nurse is on call at all times during these shifts. This indicates that the ultimate responsibility rests with the supervisory nurse, not the charge nurse. Cf. Northeast Utilities Serv. Corp. v. NLRB, 35 F.3d 621, 625 (1st Cir.1994) (considering as one factor in determining whether a person responsibly directed other employees that "during nonbusiness hours ... a supervisor is always on call."), cert. denied, 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995). Moreover, staff RNs are professionals who do not require close supervision when they are on duty. When their supervisory nurse is not physically present at Providence, staff RNs, as professionals, continue to carry out the supervisory nurse's instructions and orders. See NLRB v. KDFW-TV, Inc., 790 F.2d 1273, 1279 (5th Cir.1986) (because supervisors were "available for consultation", and because "many decisions regarding the after hours operation [were] made during weekdays", when supervisors were present, fact that no supervisors were on-site at some times does not mean other employees were supervisors).
 
 CONCLUSION
 
 38
 Substantial evidence supports the Board's finding that the RNs in the disputed charge nurse positions are not supervisors under Section 2(11) of the NLRA. Providence's petition for review is DENIED, and the Board's cross-application for enforcement of its order is GRANTED.
 
 NOONAN, Circuit Judge, dissenting:
 
 39
 This case is rightly considered a close one. It is close because the governing decision by the Supreme court, NLRB v. Health Care & Retirement Corp. of America, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994) (hereafter H.C.R.) was decided by a five-to-four vote of the Court and because of the existence in this circuit of precedents which give more deference to the Board than H.C.R. permits. Applying H.C.R., we must decide against the Board.
 
 
 40
 The case is governed by the same statute, whose relevant terms bear repeating: A supervisor is
 
 
 41
 [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. 29 U.S.C. § 152(11).
 
 
 42
 As in H.C.R. the Board has created an ambiguity in the statute that it purports to resolve by its interpretation. The Board declares:
 
 
 43
 "Our basic disagreement with our dissenting colleague is that he fails to fully recognize that the 'essence' of the job of all RNs, and not just charge nurses, is 'judgment'. The evidence in this case demonstrates that all RNs, in whatever their capacity, regularly exercise judgment as professional employees that differs little in effect from any additional authority exercised by RNs when serving as charge nurses. As explained above, the essence of professionalism requires the exercise of expert judgment and the essence of supervision requires the exercise of independent judgment. And as detailed below, the alleged supervisory independent judgment of charge nurses when examined in detail becomes indistinguishable from the professional judgment exercised by all RNs." Providence Hosp., 520 N.L.R.B. 717, 730 (1996).
 
 
 44
 Finding professional judgment "indistinguishable" from supervisory independent judgment, the Board in effect declares that a professional who is supervising other professionals cannot be a supervisor. The Board seriously distorts the statute which requires only two things of a supervisor: the ability "responsibly to direct" and "the use of independent judgment." Making the use of independent judgment a disqualifying factor, the Board reads the statute backwards.
 
 
 45
 What the Board has done in this case is exactly analogous to what it did in its earlier test disapproved in H.C.R.: "Under the Board's test, however, a nurse who in the course of employment uses independent judgment to engage in responsible direction of other employees is not a supervisor." H.C.R., 511 U.S. at 579, 114 S.Ct. at 1783. As the Court remarked on this position: "The Board provides no plausible justification, however, for reading the responsible direction portion of § 2(11) out of the statute in nurse cases, and we can perceive none." Id. No plausible justification is provided for doing the same thing here.
 
 
 46
 The Board has shown considerable hostility to the exclusion of managerial professionals from bargaining units. As in H.C.R. and in NLRB v. Yeshiva University, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), the Board tries to deal with the tension in the Act between the exclusion of supervisory employees and the Act's inclusion of professionals by developing a policy to deal with the tension. But it is not permissible for the Board to resolve the tension and develop its own policy by distorting the statutory language. Id. at 686, 100 S.Ct. at 864.
 
 
 47
 The Board's own practice and precedent does not support the Board's position as Member Cohen forcefully noted in his dissent from the Board's decision. In the Board's § 8(a)(1) cases the Board has found supervisory status with respect to individuals having authority comparable to the charge nurses. See, e.g., Great American Products, 312 N.L.R.B. 962 (1993); Clark & Wilkins Industries, Inc., 290 N.L.R.B. 106 (1988). Specifically as to nurses the Board found in the unfair labor practice cases that charge nurses were supervisors. Avon Convalescent Center, Inc., 200 N.L.R.B. 702 (1972), enforced, N.L.R.B. v. Avon Convalescent Center, Inc., 490 F.2d 1384 (6th Cir.1974); Rockville Nursing Center, 193 N.L.R.B. 959 (1971).
 
 
 48
 In the decision that was appealed in H.C.R. the Board did not challenge the exercise of supervisory powers of the charge nurses and did not argue that they lacked independent judgment. It was only when the Board's position was rejected by the Supreme court in H.C.R. that the Board's new interpretation saw the light of day. Deference should not be accorded an interpretation that it has taken 50 years to reach and, as member Cohen suggested, has been brought forward as an end run around H.C.R. as decided by the Supreme Court.
 
 
 49
 What do the charge nurses do? At the beginning of each shift they assign patients to nurses. To do so the charge nurse considers the needs of the patient, the skills of the staff and the experience of the staff members available. Of course that assignment requires professional judgment. Of course that assignment requires independent judgment. Anyone who has had the experience of being a patient in a hospital knows that the thoughtful matching of nurse to patient is a high art. The judgment exercised is not, in the language of the statute, "routine or clerical." That the charge nurse in exercising this judgment may call on the experience and skill she has accumulated in her regular role as a nurse does not for a moment make the judgment she uses less than independent.
 
 
 50
 The assignment function alone would establish the charge nurses as supervisors. In addition, they determine whether the center which they are in charge of is overstaffed or understaffed. They effectively decide when to ask the person under their direction to work overtime. They approve breaks by the other nurses. They fill out evaluations for management of the performance of the other nurses. These functions confirm their supervisory status. In recognition of it they are paid more than the regular RNs when they serve as charge nurses.
 
 
 51
 As the charge nurses should not have been included in the bargaining unit, the election should be invalidated and it is unnecessary to consider the position of the home health care team leaders and the team leader assistants. There can be little doubt that they, too, "responsibly direct" other employees and exercise a professional and independent judgment that qualifies them as supervisors.
 
 
 52
 I would deny enforcement of the order of the Board.
 
 
 
 [1]
 These five disputed positions are: charge nurse in four of Providence's six care centers, home health care team leader and team leader assistant, on-call lead home health care RN, and employee health staff nurse
 
 
 [2]
 The Board's order is based in part on findings made during the Board's earlier representation hearing. See Providence Hospital, 320 N.L.R.B. 717 (1996). In that hearing, the Board determined that the nurses in fourteen of seventeen disputed positions at Providence were not supervisors. The record of that hearing is also before us, pursuant to Section 9(d) of the NLRA, 29 U.S.C. § 159(d). See Boire v. Greyhound Corp., 376 U.S. 473, 477-79, 84 S.Ct. 894, 896-97, 11 L.Ed.2d 849 (1964). We review the record of the representation hearing in determining whether to "enforc[e], modify[ ], or set[ ] aside in whole or in part the [unfair labor practice] order of the Board." 29 U.S.C. § 159(d)
 
 
 [3]
 This exclusion was created because of legislators' belief "[t]hat an employer is entitled to the undivided loyalty of its representatives." NLRB v. Yeshiva Univ., 444 U.S. 672, 682, 100 S.Ct. 856, 862, 63 L.Ed.2d 115 (1980). This exclusion was also designed, "in part, to protect employees from supervisor influence within the union's organization." NLRB v. Metropolitan Life Ins. Co., 405 F.2d 1169, 1178 (2d Cir.1968)
 
 
 [4]
 The premise of Providence's argument is not completely accurate. Some of the units in some of the centers at Providence do have supervisors on all shifts, including the night and weekend shifts